**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN HOPKINSON, derivatively on behalf of REGENERON PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GEORGE D. YANCOPOULOS, ISRAEL LOWY, RYAN CROWE, BONNIE L. BASSLER, MICHAEL S. BROWN, N. ANTHONY COLES, JOSEPH L. GOLDSTEIN, KATHRYN GUARINI, CHRISTINE A. POON, LEONARD S. SCHLEIFER, DAVID P. SCHENKEIN, GEORGE L. SING, CRAIG B. THOMPSON, and HUDA Y. ZOGHBI,<br><br>Defendants,<br><br>and<br><br>REGENERON PHARMACEUTICALS, INC.,<br><br>Nominal Defendant. | Case No.:7:26-cv-8311<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Steven Hopkinson ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Regeneron Pharmaceuticals, Inc. ("Regeneron" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants George D. Yancopoulos ("Yancopoulos"), Israel Lowy ("Lowy"), Ryan Crowe ("Crowe"), Bonnie L. Bassler ("Bassler"), Michael S. Brown ("Brown"), N. Anthony Coles ("Coles"), Joseph L. Goldstein

("Goldstein"), Kathryn Guarini ("Guarini"), Christine A. Poon ("Poon"), Leonard S. Schleifer ("Schleifer"), David P. Schenkein ("Schenkein"), George L. Sing ("Sing"), Craig B. Thompson ("Thompson"), and Huda Y. Zoghbi ("Zoghbi") (collectively, the "Individual Defendants," and together with Regeneron, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Regeneron, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Yancopoulos, Lowy, and Crowe for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Regeneron, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from August 1, 2025, through May 15, 2026, both dates inclusive (the "Relevant Period").

2. Regeneron is a biotechnology company that designs, develops, produces, and sells medical treatments for, *inter alia*, eye disease, allergic and inflammatory diseases, cardiovascular

disease, and cancer.

3. The Company's product development and research include several investigational product combinations, such as a combination of fianlimab and Libtayo (also known by its generic name cemiplimab). Fianlimab is a human monoclonal antibody that targets the immune receptor checkpoint LAG-3 on T-cells. Cemiplimab is a human monoclonal antibody that targets PD-1 immune receptor checkpoint on T-cells. The Company's clinical trial investigating this combination is centered on evaluating its safety, viability, and efficacy as a first-line melanoma treatment.

4. By 2022, the Company initiated and began enrolling patients for Phase III of the Fianlimab Trial ("Phase III Fianlimab Trial").

5. During the Relevant Period, the Individual Defendants touted their confidence in the statistical viability of the Phase III Fianlimab Trial and minimized the risks facing the Phase III Fianlimab Trial. For example, on December 3, 2025, Defendant Crowe represented the Company at the Citi Annual Global Healthcare Conference("Citi 2025 Conference"). During the Citi 2025 Conference, Defendant Crow stated, in relevant part: "***[w]e have a lot of hope and confidence that fianlimab-plus Libtayo can generate a meaningful differentiation against current standards of care*** . . . ***I think we'd have a very meaningful advanced -- for first line advanced melanoma.***"[1]

6. However, the truth began to emerge on April 29, 2026, when Regeneron disclosed during its earnings call for the period ended on March 31, 2026 ("Q1 2026 Earnings Call"), protocol changes to the Phase III Fianlimab Trial—including the expansion of the eligible patient pool.

[1] All emphasis herein is added unless otherwise stated.

7. On this news, the price of the Company's common stock dropped $45.41 or approximately 6.2%, from a closing price $731.77 per share on April 28, 2026, to a closing price of $686.36 per share on April 29, 2026.

8. The truth fully emerged on May 15, 2026, when Regeneron issued a press release ("May 2025 Press Release") announcing that the "Phase 3 Trial of Fianlimab . . . did not reach statistical significance for the primary endpoint of improvement in progression-free survival (PFS)."

9. On this news, the Company's common stock dropped $68.57 or approximately 9.8%, from a closing price of $698.25 per share on May 15, 2026, to a closing price of $629.68 per share on May 18, 2026.

10. During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and/or directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Individual Defendants downplayed the risks to the Phase III Fianlimab Trial's statistical viability and the impact of sudden protocol changes; (2) the success of the Phase III Fianlimab Trial was overstated and lacked reliable evidence; and (3) as a result, the Phase III Fianlimab Trial would likely fail to reach its primary endpoint. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

11. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal control.

12. In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Regeneron to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between November 2025 and May 2026, approximately 2,987,433 shares of Regeneron common stock were repurchased, costing the Company approximately $2.2 billion. As the Company's stock was actually worth only $629.68 per share, the price at which it was trading when markets closed on May 18, 2026, the Company overpaid for repurchases of its own stock ***by approximately $297 million in total***.

13. Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while three of the Individual Defendants engaged in improper insider sales, ***netting combined total proceeds of approximately $7.3 million.***

14. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Scientific Officer ("CSO") and Co-Founder, its Senior Vice President ("SVP") and Clinical Development Unit Head of Oncology, and its SVP of Investor Relations and Strategic Analysis to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

16. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of various of the directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. §78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District,

or he or she is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

22. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

23. Plaintiff is a current shareholder of Regeneron. Plaintiff has continuously owned Company common stock at all relevant times.

### Nominal Defendant Regeneron

24. Regeneron is a New York corporation with its principal executive offices at 777 Old Saw Mill River Road, Tarrytown, New York 10591-6707. Regeneron's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "REGN."

### Defendant Yancopoulos

25. Defendant Yancopoulos co-founded the Company and has served as a Company director since 2001 and as the Co-Chair of the Board since June 2023. He also serves as the Company's CSO. Additionally, he also serves as a member of the Technology Committee and the Digital Technology Committee.

26. The Schedule 14A the Company filed with the SEC on April 24, 2026 (the "2026 Proxy Statement") stated the following about Defendant Yancopoulos, in relevant part:

> Career Highlights
>
> •Founding scientist of the Company; built and managed the Company since

1989 together with Dr. Schleifer

•President and Chief Scientific Officer of the Company

•Co-Chair of the Board since 2023 and director of the Company since 2001

•11th most highly cited scientist in the world in the 1990s

•Principal inventor and/or developer, together with key members of his team, of the 13 FDA-approved drugs the Company has developed, EYLEA® (aflibercept) Injection, EYLEA HD® (aflibercept) 8 mg, Dupixent® (dupilumab), Libtayo® (cemiplimab), Praluent® (alirocumab), Kevzara® (sarilumab), Lynozyfic® (linvoseltamab), Evkeeza® (evinacumab-dgnb), Inmazeb® (atoltivimab, maftivimab and odesivimab-ebgn), Veopoz® (pozelimab) Injection, Otarmeni™ (lunsotogene parvec-cwha), ZALTRAP® (ziv-aflibercept) Injection for Intravenous Infusion, and ARCALYST® (rilonacept) Injection for Subcutaneous Use, as well as of its foundation technologies, including the TRAP technology, *VelociGene*®, and *VelocImmune*®

**Defendant Lowy**

27. Defendant Lowy has served as the Company's SVP and Clinical Development Unit Head of Oncology since January 2019.

**Defendant Crowe**

28. Defendant Crowe has served as the Company's SVP of Investor Relations and Strategic Analysis since January 2024.

**Defendant Bassler**

29. Defendant Bassler has served as a Company director since 2016. Defendant Bassler also serves as a member of the Technology Committee and the Corporate Governance and Compliance Committee.

30. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Bassler made the following sales of Company common stock:

| **Date** | **Number of Shares** | **Avg. Price/ Share** | **Proceeds** |
|---|---|---|---|
| November 20, 2025 | 760 | $750 | $570,000 |
| January 7, 2026 | 1,500 | $800 | $1,200,000 |

Thus, in total, before the fraud was exposed, Defendant Bassler sold 2,260 shares of Company stock on inside information, for which she received approximately $1.8 million in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

31. The 2026 Proxy Statement stated the following about Defendant Bassler, in relevant part:

> Career Highlights
>
> •Andrew K. Golden University Professor since 2025, Squibb Professor in Molecular Biology since 2003, and former Chair of the Department of Molecular Biology from 2013 to 2015 at Princeton University
>
> •Howard Hughes Medical Institute Investigator
>
> •Former President of the American Society for Microbiology
>
> •Former member of the board of the American Association for the Advancement of Science, the National Science Foundation, and the American Academy of Microbiology
>
> •U.S. National Medal of Science
>
> •MacArthur Foundation Fellowship•Lounsbery Award
>
> •Shaw Prize for Life Science and Medicine
>
> •Gruber Prize in Genetics•Wolf Prize in Chemistry
>
> •Canada Gairdner International Award
>
> •Former director of Kaleido Biosciences, Inc. and Cidara Therapeutics, Inc

**<u>Defendant Brown</u>**

32. Defendant Brown has served as a Company director since 1991. He also serves as the Chair of the Technology Committee and as a member of the Corporate Governance and Compliance Committee.

33. The 2026 Proxy Statement stated the following about Defendant Brown, in relevant part:

> Career Highlights
>
> •Distinguished Chair in Biomedical Sciences since 1989 and Regental Professor of Molecular Genetics and Internal Medicine and Director of the Jonsson Center for Molecular Genetics since 1985 at The University of Texas Southwestern Medical Center at Dallas
>
> •Nobel Prize for Physiology or Medicine in 1985 (jointly with Dr. Goldstein)
>
> •U.S. National Medal of Science in 1988 (jointly with Dr. Goldstein)

**<u>Defendant Coles</u>**

34. Defendant Coles has served as a Company director since 2017. Defendant Coles also serves a member of the Audit Committee and the Compensation Committee.

35. The 2026 Proxy Statement stated the following about Defendant Coles, in relevant part:

> Career Highlights
>
> •Chair and CEO of TRATE Enterprises LLC, a privately-held company, since 2013
>
> •Former Chair (from 2018 to 2024) and President and Chief Executive Officer (from 2019 to 2023) of Cerevel Therapeutics Holdings, Inc., the parent entity of Cerevel Therapeutics, Inc.
>
> •Former Chief Executive Officer and Chair of the Board of Yumanity Therapeutics, Inc.

•Former President, Chief Executive Officer and Chair of the Board of Onyx Pharmaceuticals, Inc.

•Former President, Chief Executive Officer, and member of the board of directors of NPS Pharmaceuticals, Inc.

•Previously held various leadership positions in the biopharmaceutical and pharmaceutical industries, including at Merck & Co., Inc., Bristol-Myers Squibb Company, and Vertex Pharmaceuticals Incorporated

•Former director of Laboratory Corporation of America Holdings, Campus Crest Communities, Inc., CRISPR Therapeutics AG, and McKesson Corporation

**Defendant Goldstein**

36. Defendant Goldstein has served as a Company director since 1991. He also serves as a member of the Technology Committee and the Corporate Governance and Compliance Committee.

37. The 2026 Proxy Statement stated the following about Defendant Goldstein, in relevant part:

Career Highlights

•Regental Professor of Molecular Genetics and Internal Medicine and Chair of the Department of Molecular Genetics at The University of Texas Southwestern Medical Center at Dallas since 1977

•Member of the boards of trustees of The Rockefeller University and the Howard Hughes Medical Institute

•Nobel Prize for Physiology or Medicine in 1985 (jointly with Dr. Brown)

•U.S. National Medal of Science in 1988 (jointly with Dr. Brown)

**Defendant Guarini**

38. Defendant Guarini has served as a Company director since September 2023. She also serves as a member of the Audit Committee and the Chair of the Digital Technology Committee.

39. The 2026 Proxy Statement stated the following about Defendant Guarini, in relevant part:

> Career Highlights
> •Former Chief Information Officer of International Business Machines Corporation (IBM) from 2021 to 2023
>
> •Previously held positions of increasing responsibility at IBM, including Vice President, Chief Operating Officer of IBM Research from 2020 to 2021; Vice President, Industry Research of IBM Research from 2018 to 2020; Vice President, Research Strategy of IBM Research from 2017 to 2018; and Vice President, Product Management of IBM Systems from 2014 to 2016

**Defendant Poon**

40. Defendant Poon has served as a Company director since 2010 and has served as the Company's Lead Independent Director since 2023. She also serves as the Chair of the Compensation Committee and as a member of the Corporate Governance and Compliance Committee.

41. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Poon made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share | Proceeds |
|---|---|---|---|
| October 29, 2025 | 650 | $652.68 | $424,242 |
| October 29, 2025 | 2,735 | $653.50 | $1,787,323 |
| October 29, 2025 | 1,915 | $654.42 | $1,253,214 |
| October 29, 2025 | 100 | $655.10 | $65,510 |
| October 29, 2025 | 712 | $656.50 | $467,428 |
| October 29, 2025 | 388 | $657.29 | $255,029 |

Thus, in total, before the fraud was exposed, Defendant Poon sold 6,500 shares of Company stock on inside information, for which she received approximately $4.3 million in total proceeds. Her

insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

42. The 2026 Proxy Statement stated the following about Defendant Poon, in relevant part:

> Career Highlights
>
> •Former Executive-in-Residence in the Department of Management and Human Resources (from 2015 to 2020) and former Dean and John W. Berry, Sr. Chair in Business (from 2009 to 2014) at The Max M. Fisher College of Business at The Ohio State University
>
> •Former Vice Chair, Worldwide Chair of Pharmaceuticals, member of the Executive Committee, and member of the board of directors at Johnson & Johnson
>
> •Previously held senior leadership positions at Bristol-Myers Squibb Company, including President of International Medicines and President of Medical Devices
>
> •Former member of the Supervisory Board of Royal Philips Electronics and the boards of directors of Decibel Therapeutics, Inc. and The Sherwin-Williams Company

**<u>Defendant Schleifer</u>**

43. Defendant Schleifer founded Regeneron in 1988 and has since served as its President, CEO, and as a Company director. Since 2023, Defendant Schleifer has also served as the Co-Chair of the Board. Defendant Schleifer also serves as a member of the Technology Committee.

44. The 2026 Proxy Statement stated the following about Defendant Schleifer:

> Career Highlights
>
> •Founded the Company in 1988; built and managed the Company over the past 38 years together with Regeneron's founding scientist, Dr. Yancopoulos
>
> •Director, President, and Chief Executive Officer of the Company since its inception

•Co-Chair of the Board since 2023; former Chair of the Board from 1990 through 1994

•Licensed physician certified in Neurology by the American Board of Psychiatry and Neurology

**Defendant Schenkein**

45. Defendant Schenkein has served as a Company director since September 2023. He also serves as a member of the Technology Committee, Digital Technology Committee, and the Compensation Committee.

46. The 2026 Proxy Statement stated the following about Defendant Schenkein, in relevant part:

Career Highlights

•General Partner and Co-lead of the Life Sciences team of GV (formerly Google Ventures) since 2019

•Adjunct attending physician in hematology at Tufts Medical Center since 2009

•Former President, Chief Executive Officer, Chair, and director of Agios Pharmaceuticals, Inc., where he continues to serve as a strategic advisor

•Former Senior Vice President, Clinical Hematology/Oncology at Genentech Inc.

•Former Adjunct Clinical Professor of Medical Oncology at Stanford University School of Medicine

•Former Senior Vice President of Clinical Research at Millennium Pharmaceuticals, Inc.

•Former director of Foundation Medicine, Inc. and bluebird bio, Inc.

**Defendant Sing**

47. Defendant Sing has served as a Company director since 1988. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee.

48. The 2026 Proxy Statement stated the following about Defendant Sing, in relevant

part:

> Career Highlights
>
> •Chief Executive Officer of GanD, Inc. since 2016
>
> •Chair of Grace Science, LLC since 2017
>
> •Extensive venture capital and leadership experience in the biotechnology sector and high technology

**Defendant Thompson**

49. Defendant Thompson has served as a Company director since 2022. He also serves as a member of the Technology Committee, Digital Technology Committee, and Chair of the Corporate Governance and Compliance Committee.

50. The 2026 Proxy Statement stated the following about Defendant Thompson, in relevant part:

> Career Highlights
>
> •Former President and Chief Executive Officer of Memorial Sloan Kettering Cancer Center from 2010 to 2022, where he continues to oversee the Craig Thompson Lab
>
> •Co-founder of Agios Pharmaceuticals, Inc.
>
> •Former director of Merck & Co., Inc.

**Defendant Zoghbi**

51. Defendant Zoghbi has served as a Company director since 2016. She also serves as a member of the Technology Committee, Digital Technology Committee, and the Compensation Committee.

52. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Zoghbi made the following sales of Company common stock:

| **Date** | **Number of Shares** | **Avg. Price/ Share** | **Proceeds** |
|---|---|---|---|
| February 19, 2026 | 49 | $774.68 | $37,959 |
| February 19, 2026 | 50 | $775.50 | $38,775 |
| February 19, 2026 | 53 | $778.47 | $41,259 |
| February 19, 2026 | 208 | $779.55 | $162,146 |
| February 19, 2026 | 331 | $780.45 | $258,329 |
| February 19, 2026 | 209 | $781.28 | $163,288 |
| February 19, 2026 | 298 | $782.10 | $233,066 |
| February 19, 2026 | 220 | $783.29 | $172,324 |
| February 19, 2026 | 160 | $784.45 | $125,512 |
| February 19, 2026 | 56 | $785.61 | $43,994 |
| February 19, 2026 | 4 | $790.00 | $3,160 |

Thus, in total, before the fraud was exposed, Defendant Zoghbi sold 1,638 shares of Company stock on inside information, for which she received approximately $1.3 million in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

53. The 2026 Proxy Statement stated the following about Defendant Zoghbi, in relevant part:

> Career Highlights
>
> •Professor in the Departments of Pediatrics, Molecular and Human Genetics, and Neurology and Neuroscience at Baylor College of Medicine since 1994
>
> •Director of the Jan and Dan Duncan Neurological Research Institute at Texas Children's Hospital
>
> •Howard Hughes Medical Institute Investigator
>
> •Breakthrough Prize in Life Sciences

•Pearl Meister Greengard Prize

•March of Dimes Prize in Developmental Biology

•Vanderbilt Prize in Biomedical Science

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

54. By reason of their positions as officers, directors, and/or fiduciaries of Regeneron and because of their ability to control the business and corporate affairs of Regeneron, the Individual Defendants owed Regeneron and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Regeneron in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Regeneron and its shareholders so as to benefit all shareholders equally.

55. Each director and officer of the Company owes to Regeneron and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

56. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Regeneron, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

57. To discharge their duties, the officers and directors of Regeneron were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

58. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of

the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Regeneron, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Regeneron's Board at all relevant times.

59. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

60. To discharge their duties, the officers and directors of Regeneron were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Regeneron were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New York and the United States, and pursuant to Regeneron's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Regeneron conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Regeneron and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Regeneron's operations would comply with all applicable laws and Regeneron's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial

information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

61. Each of the Individual Defendants further owed to Regeneron and the shareholders the duty of loyalty requiring that each favor Regeneron's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

62. At all times relevant hereto, the Individual Defendants were the agents of each other and of Regeneron and were at all times acting within the course and scope of such agency.

63. Because of their advisory, executive, managerial, directorial, and controlling positions with Regeneron, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

64. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Regeneron.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

65. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

66. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

67. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Regeneron was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

68. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

69. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Regeneron, and was at all times acting within the course and scope of such agency.

## REGENERON'S CODE OF CONDUCT

70. The Company maintains a Code of Conduct which emphasizes Regeneron's commitment to operating in an ethical manner. In the section titled, "Our Shared Responsibilities," the Code of Conduct states, in relevant part:

> As a biopharmaceutical company, Regeneron is called to meet significant ethical obligations to patients and customers, and is subject to diverse and complex laws and regulations in all markets in which we operate. We have a responsibility to adhere to the highest ethical Community Both the Company and each individual colleague have a responsibility to act ethically and with integrity at all times. standards as we engage in the privilege of conducting research and developing, manufacturing, and commercializing medicines that can help improve patients' lives. Our Code of Business Conduct and Ethics (the Code) brings together Regeneron's key policy principles and establishes our expectations for all of us to assure that we are always acting in accordance with applicable laws, rules, and regulations.

71. In the same section, the Code of Conduct states that it applies to "all officers, directors, and personnel[.]"

72. In the same section, the Code of Conduct further details Regeneron's corporate compliance efforts, providing:

> **REGENERON'S CORPORATE COMPLIANCE PROGRAM**
>
> At Regeneron, we are guided by our strong moral compass and our desire to help people with serious diseases. We take a collaborative approach to compliance to ensure that compliance principles and culture are embedded into each business unit. This high engagement, high-integrity culture sets us apart and ensures that the highest standards of quality and integrity inform our every action, whether in our labs, manufacturing facilities, or product delivery.
>
> Our Corporate Compliance Program oversees a set of internal standards and controls that promote the prevention, detection, and correction of conduct that is illegal or that does not conform to our high standards of ethical conduct. It is an integral and routine part of our operations that demonstrates our firm commitment to operating ethically and in compliance with the laws and regulations that we abide by.
>
> The effectiveness of Regeneron's Corporate Compliance Program begins with the support and public commitment of the Company's leadership. The members of the Company's Board of Directors, the Chief Executive Officer (CEO), and the members of our senior leadership team are committed to governing and growing

> the Company through ethical and compliant business strategies.
>
> **THE WAY IT WORKS**
>
> Our Corporate Compliance Program is led by the Chief Compliance Officer (CCO) with oversight by the CEO and the Corporate Governance and Compliance Committee of the Board of Directors. Support is provided by the Corporate Compliance Committee, which is made up of senior leaders throughout the Company. But compliance is more than just rules and a few senior people. Compliance is about working in a culture where each of us is responsible and accountable for conducting business ethically. We are all responsible for understanding and complying with this Code and the policies and procedures relevant to our roles at Regeneron.

(Emphasis in original).

73. In the same section and under the heading "Speak Up And Ask Questions," the Code of Conduct, further details the reporting requirements of Regeneron's directors, officers, and employees, providing, in relevant part:

> All colleagues have a duty to act and a responsibility to speak up and promptly report known or potential violations of law or policy, or other valid concerns and questions. Employees who raise potential compliance concerns help Regeneron to correct problems before they grow. To do this, Regeneron maintains an Open Door policy that is proactively communicated to employees and encourages open discussion of significant issues that impact the Company as well as issues that may involve misconduct without fear of retaliation.
>
> ***
>
> The ability to discuss ethical and legal issues without fear of retaliation is vital to the effectiveness of our Corporate Compliance Program. We make every effort to maintain, within the limits of the law, the confidentiality of any individual who reports possible misconduct Moreover, we will not tolerate retaliation against anyone who, in good faith, reports an ethical or legal concern. We also want to hear your feedback. Our Corporate Compliance team, along with the Board of Directors, is committed to removing unnecessary bureaucratic roadblocks and not just doing things the way they have been done in the past. We encourage you to provide feedback on our Corporate Compliance Program and suggestions for improvement.

74. In the section titled "Our Responsibility to Stakeholders," the Code of Conduct provides the following, in pertinent part:

> **MAINTAINING BOOKS AND RECORDS**
>
> Regeneron is committed to maintaining and supplying accurate books and records for all of our transactions and Company data. Our records serve as the basis for managing our business and are necessary for meeting critical obligations to our stakeholders, including patients, shareholders, customers, partners, employees, government agencies, and others with whom we do business. All of Regeneron's books, records, and accounts must completely and accurately reflect the true nature of our business transactions and Company data in reasonable detail. All transactions must be authorized and recorded in compliance with Regeneron policies and applicable laws in a timely manner. Falsifying records and entries or misrepresenting facts or information could violate the law and result in severe penalties. Falsification of scientific data may also ultimately endanger patients.
>
> ***
>
> **FINANCIAL INTEGRITY**
>
> Regeneron has legal responsibilities to make complete, accurate, and timely disclosures in all reports and documents that we file with government agencies. Financial records include those that we report publicly, such as those contained in our U.S. Securities and Exchange Commission filings, but also other internal records that contain financial information and form the foundation for our public and other official disclosures. The Disclosure Committee consists of members of senior management of the Company who assist in monitoring relevant disclosures. In addition, all employees are responsible for playing a part in ensuring that we meet our financial reporting responsibilities by creating and submitting accurate financial reports and documents.

(Emphasis in original).

75. In the same section, the Code of Conduct further includes policies relating to conflicts of interest, providing in relevant part:

> **CONFLICTS OF INTEREST**
>
> Our business decisions must prioritize Regeneron's best interests. A conflict of interest arises when personal, financial, or other relationships interfere with an employee's ability to make impartial decisions for the Company. Even the appearance of such conflicts can harm trust and reputation. While we respect employees' rights to manage their personal affairs, it is essential to avoid situations where personal, business, or financial relationships could compromise your duties or Regeneron's interests. Employees must disclose any actual or potential conflicts

> of interest to their manager or Human Resources as soon as they arise. If you are uncertain about whether a situation constitutes a conflict, promptly seek guidance. For more details, refer to our Conflict of Interest Policy, which provides examples, reporting obligations, and resolution processes. Adhering to these guidelines ensures decisions remain fair, transparent, and aligned with Regeneron's values.
>
> ***
>
> Any conflict of interest or potential conflict of interest must be disclosed in writing and approved by your supervisor, preferably in advance. Your supervisor will determine whether Corporate Compliance or the Law Department needs to be consulted or notified.

(Emphasis in original).

76. In the same section, the Code of Conduct further provides the following, in relevant part:

> **INSIDER TRADING**
>
> There may be times in the course of your job when you come across material, non-public information about our Company, our products or product candidates, or other matters relating to Regeneron. Regeneron policy and the laws of many jurisdictions (particularly the U.S. where Regeneron's shares are publicly traded) prohibit employees anywhere in the world, directly or indirectly through their families or others, from purchasing or selling, or otherwise engaging in any transactions involving Regeneron securities while in the possession of material, non-public information (insider information). Securities are defined very broadly, and include stock, options, puts, calls, publicly traded debt, and stock held in a retirement savings account. It does not matter whether profit was made or losses avoided.
>
> The same prohibition applies to trading securities of other publicly held companies on the basis of insider information, including the Company's collaborators or other parties with which the Company does business or other companies whose confidential information you may learn about in the course of your service at Regeneron. Violations of securities laws, including those prohibiting insider trading, are very serious and can result in severe civil and criminal liability. You should carefully review the periodic memoranda distributed by the General Counsel that provide further guidance on Regeneron's process on appropriately engaging in transactions involving Regeneron securities. If you have a question on engaging in any transactions involving Regeneron securities, or the securities of competitors, collaborators, or other companies whose confidential information you may learn about in the course of your service at Regeneron, you should contact the General Counsel.

(Emphasis in original).

77. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue and/or cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Moreover, three of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting proceeds of approximately $7.3 million. Also, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**REGENERON'S AUDIT COMMITTEE CHARTER**

78. Regeneron also maintains an Audit Committee Charter (the "Audit Committee Charter") which describes the Audit Committee's purpose as, in relevant part:

> The Committee's purpose is to provide assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial reporting and internal control and legal compliance functions of the Corporation, including, without limitation, (a) assisting the Board in its oversight function by monitoring (i) the integrity of the Corporation's financial statements, (ii) the Corporation's compliance with legal and regulatory requirements, (iii) the Corporation's independent auditors' qualifications and independence, and (iv) the performance of the Corporation's independent auditors and the Corporation's internal audit function, if applicable, and (b) preparing the report required to be prepared by the Committee pursuant to the rules of the Securities and Exchange Commission (the "SEC") for inclusion in the Corporation's annual proxy statement. It is the objective of the Committee to maintain free and open means of communications among the Board, the independent auditors and the financial and senior management of the Corporation.

79. In the section titled "Duties and Responsibilities of the Committee," the Audit

Committee Charter provides the following, in relevant part:

> **Oversight and Evaluation of Internal Audit**
>
> (h) Evaluate the internal audit process for establishing the annual audit plan and the focus on risk;
>
> (i) Evaluate the audit scope and role of internal audit;
>
> (j) Consider and review with management:
>
> (i) The planned scope of the internal audit plan;
>
> (ii) The internal audit budget;
>
> (iii) Significant findings and management's response including the timetable for implementation to correct weaknesses; and
>
> (iv) Any difficulties encountered in the course of the internal audit such as restrictions on the scope of their work or access to information;
>
> (k) Review and approve the appointment and replacement of the Corporation's Chief Audit Executive (CAE), if applicable, and any outside entities supplying internal audit services and evaluate on an annual basis the performance of the CAE and any such entities.
>
> **Annual Audit and Quarterly Reviews**
>
> ***
>
> (n) Review the results of the year-end audit of the Corporation, including any comments or recommendations of the Corporation's independent auditors;
>
> (o) Review with management, the Corporation's independent auditors and, if applicable, the Chief Audit Executive, the following:
>
> (i) The Corporation's annual audited financial statements and quarterly financial statements, including the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", and any major issues related thereto;
>
> (ii) Critical accounting policies and such other accounting policies of the Corporation as are deemed appropriate for review by the Committee prior to any interim or year-end filings with the SEC or other regulatory body, including any financial reporting issues which could have a material impact on the Corporation's financial statements, as well as any critical audit matters arising from the

current period audit;

(iii) Major issues regarding accounting principles and financial statements, presentations, including (A) any significant changes in the Corporation's selection or application of accounting principles and (B) any analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the ramifications and effects of alternative generally accepted accounting principles methods on the Corporation's financial statements;

***

(p) Review with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaints or published reports which raise material issues regarding the Corporation’s financial statements or accounting policies;

(q) Confirm that the Corporation's interim financial statements included in Quarterly Reports on Form 10-Q have been reviewed by the Corporation's independent auditors and review with management and the independent auditors results of the independent auditors’ review of the interim financial statements;

(r) Review with the chief executive officer and chief financial officer and independent auditors, periodically, the following:

(i) Significant deficiencies in the design or operation of internal controls which could adversely affect the Corporation's ability to record, process, summarize, and report financial data, including any material weaknesses in internal controls identified by the Corporation's independent auditors;

(ii) Fraud that involves management or other employees of the Corporation; and

(iii) Significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses.

(s) Periodically review with the Chief Financial Officer, and Chief Executive Officer, as applicable, the quality of earnings, including the following:

- Overall consistency of accounting policies from year to year or quarter to quarter
- Overall degree of estimation or subjectivity in determining operating results
- Transparency of footnote disclosures
- Complexity of MD&A and discussion of non-recurring, unusual transactions

> - Presence of pro forma measures of operating results
> - Disclosure of related party transactions
> - Trend in reserve balances
> - Uncertainties and contingencies disclosed in footnotes and MD&A;
>
> ***
>
> (v) Review the Corporation's earnings press releases (including, if applicable, the use of “pro forma” or “adjusted” information not prepared in compliance with generally accepted accounting principles);

(Emphasis in original).

80. In the same section, the Audit Committee Charter also addresses the Audit Committee’s financial reporting and internal controls responsibilities, stating, in relevant part:

> (w) Review the adequacy and effectiveness of the Corporation's accounting and internal control policies and procedures and disclosure procedures through inquiry and discussions with management of the Corporation and the Corporation's independent auditors;
>
> (x) Review the yearly report prepared by management assessing the effectiveness of the Corporation's internal control structure and procedures for financial reporting and stating management's responsibility to establish and maintain such structure and procedures, prior to its inclusion in the Corporation's annual report;
>
> (y) Review with management the Corporation's administrative, operational and accounting internal controls, including controls and security of the computerized information systems and any special audit steps adopted in light of material control deficiencies, and evaluate whether the Corporation is operating in accordance with its prescribed policies, procedures and codes of conduct;
>
> (z) Review with management and the independent auditors any significant deficiencies and material weaknesses, as defined by the Public Company Accounting Oversight Board, affecting internal control, as per paragraphs (w) and (x) above;
>
> (aa) Receive periodic reports from the Corporation's independent auditors and management of the Corporation to assess the impact on the Corporation of significant accounting or financial reporting developments proposed by the Financial Accounting Standards Board or the SEC or other regulatory body, or any other significant accounting or financial reporting related matters that may have a bearing on the Corporation. The nature of such reports will be discussed between the Committee, management of the Corporation, and the Corporation’s independent

> auditors;
>
> (bb) Establish and maintain free and open means of communication between and among the Board, the Committee, the Corporation's independent auditors, and management, including providing such parties with appropriate opportunities to meet separately and privately with the Committee on a periodic basis

81. Moreover, in the section titled "Other Matters," the Audit Committee Charter provides the following, in relevant part:

> (ee) Review the Corporation's policies relating to the avoidance of conflicts of interest and review past or proposed transactions between the Corporation and members of management as well as policies and procedures with respect to officers' expense accounts and perquisites, including the use of corporate assets.;
>
> ***
>
> (kk) Discuss with management the Corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures.
>
> (ll) Report regularly to the Board on its activities, as appropriate. In connection therewith, the Committee should review with the Board any issues that arise with respect to the quality or integrity of the Corporation's financial statements, the Corporation's compliance with legal or regulatory requirements, the performance and independence of the Corporation's independent auditors, or the performance of the internal audit function;
>
> ***
>
> (nn) Oversee the Corporation's risk management program. The Corporation's Chief Audit Executive, who reports to the Committee, implements the risk management program and provides annual reports to the Committee on the Corporation's enterprise risk profile.

82. In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue and/or cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 10(b)

and 20(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

83. Regeneron is a biotechnology company that designs, develops, produces, and sells medical treatments for, *inter alia*, eye disease, allergic and inflammatory diseases, cardiovascular disease, and cancer.

84. The Company's product development and research include a number of investigational product combinations, such as fianlimab in combination with Libtayo (also known by its generic name cemiplimab). Fianlimab is a human monoclonal antibody that targets the immune receptor checkpoint LAG-3 on T-cells. Cemiplimab is a human monoclonal antibody that targets PD-1 immune receptor checkpoint on T-cells. The Company's clinical trial studying the combination is centered on evaluating its safety, viability, and efficacy as a first-line melanoma treatment. Early clinical data including from three independent cohorts showed positive outcomes for the fianlimab cemiplimab combination.

85. By 2022, the Company initiated and began enrolling patients for the Phase III Fianlimab Trial.

### False and Misleading Statements

#### *August 1, 2025 Earnings Call*

86. The Relevant Period began on August 1, 2025, when the Company held an

earnings call for the period ended on June 30, 2025 ("Q2 2025 Earnings Call"). During the Q2 2025 Earnings Call, Defendant Yancopoulos informed investors that the results of the Phase III Fianlimab Trial were delayed, stating that:

> Libtayo is being tested in combination with fianlimab, our LAG-3 antibody in a pivotal trial in first-line advanced melanoma, a setting in which this combination has generated compelling preliminary efficacy data when compared cross-trial to PD-1 monotherapy. The primary endpoint for this study is progression-free survival and KEYTRUDA monotherapy as a control. Enrollment for the PFS cohort was completed in January as expected, but ***results are now anticipated in late 2025 or early 2026 as the blinded PFS event rate accrual has slowed in recent months.***

87. Nonetheless, the Individual Defendants omitted pertinent information about the risks of this delay including future subsequent protocol changes and an increased risk to the Phase III Fianlimab Trial. During the question-and-answer portion of the Q2 2025 Earnings Call, Defendant Yancopoulos minimized the risk of this development:

> [Q: Terence C. Flynn – Morgan Stanley, Equity Analyst]: You mentioned in the fianlimab first-line melanoma study that the event rate is slowing. So just wondering if you could speculate on reasons there and just speak to your confidence level in showing a positive readout here and remind us what the efficacy bar is that you're looking for and hoping to show.
>
> [A: Defendant Yancopoulos]: Well, ***I think that you can make a lot of speculations on what it means when you have less events than you might have planned or powered for.*** That said, what we're powering for is having minimally the sort of effect that the competitors have shown, of course, with room to show perhaps even a better effect. And as we said, ***because of the slowing of the event rates, it has now delayed when we're going to get these results.***

***November 17, 2025 Wolfe Conference***

88. On November 17, 2025, Defendant Lowy presented on behalf of the Company at the 7th Annual Wolfe Research Healthcare Conference ("Wolfe 2025 Conference"). During the Wolfe 2025 Conference, Defendant Lowy expressed his confidence in the Phase III Fianlimab Trial, overstated the findings of preliminary studies, and touted the Company's prospects. Specifically, the following exchange occurred:

> [Q: Alexandria Janet Hammond – Wolfe Research, LLC – Head of Therapeutics Research & Senior Analyst] Thank you. So I guess, looking forward, we think one of the most important readouts for you guys is your PD-1 LAG-3 in melanoma. Can you kind of walk us through the confidence there from a trial readout perspective?
>
> [A. Defendant Lowy] Sure. Thank you. And first of all, thank you for having us, and it's a pleasure to be here. And before I start, I just -- it's really exciting for us at Regeneron to be, I think, now comfortably viewed as a serious oncology company. What wasn't always the case that I think with the development of Libtayo and its success in a number of different indications, more recent success with some of our bispecifics in hematologic malignancies.
>
> ***And as we believe it will be the next big thing for us will be the readout of our LAG-3 PD-1 combination study. So when we set out to develop our LAG-3 antibody, did a number of clinical trials in first-in-human studies and we're struck to find a very high response rate in a cohort of PD-1 naive patients.***
>
> And so we repeated it twice. And we basically -- it is at the end of the day, it's a single-arm 3-part cohort of 98 patients enrolled separately. And over time, what we've seen was a superior response rate coming up to close to 60% with a PFS that over time, as we've continued to follow has certainly outperformed with the competition that was available.
>
> ***So we decided to embark on a Phase III study to actually really test it. And the study is designed to be testing 2 different doses as part of our obligation to satisfy the Optimus requirement of the FDA to demonstrate contribution of dosing. And since cemiplimab, Libtayo is not approved, as a monotherapy in melanoma, we needed to go up against another one, and we chose pembrolizumab, because basically, it was a Q3 regimen fit basically with our study and would facilitate blinding across the study, so we could do it properly.***
>
> So it also -- the study contains a calibrator arm for cemiplimab so that we know so we can demonstrate contribution of components and it's basically testing 2 different doses of fianlimab, 1,600 milligrams every 3 weeks, 400 milligrams every 3 weeks, both of them in combination with cemiplimab Libtayo versus pembrolizumab KEYTRUDA at the standard dose.

89. Defendant Lowy's response continued to highlight his confidence in the Phase III Fianlimab Trial, stating, in relevant part:

> When I've seen a lot of stuff percolating out in the literature review saying, ***oh, they're worried that there might be an unexpectedly long PFS for the control arm.*** And basically, what we can tell you is that although the label for the PFS for pembrolizumab is in the order of 4 to 5 months, and that was the expectation across multiple different trials. And certainly, that was also the area of where -- how nivolumab performed in the relativity study, we took a conservative approach and

***it set up our study so that we are actually powered to win if pembro surprises and is in the high mid-teens, mid-single digits in terms of of PFS.***

***We do believe that certainly compared to nivolumab, we are very well poised to beat what we saw in -- what was seen in that study.*** And I think there also, I'll just proactively comment that I've seen some comments about recent studies where the PFS on pembrolizumab was in the teens. But I'd point out that, that study, the IO biotech study, in particular, was one in which we feel that the patients were very cherry-picked.

They had a much lower, for example, rate of brain metastases and adverse base characteristics compared to what is in our study compared to what was in RELATIVITY-047. And compared to what was in actually the most recent study conducted, which was the LEAP study, which was a trial of pembrolizumab and lenvatinib versus pembrolizumab, where the blinded independent review of PFS for pembro was 4.5 months -- 4.6 months, something like that.

***So we are waiting for events to come in. We believe that this is because the test arms are performing well.*** But we won't know until we know. So we think that the way the events are coming in now, we should get a readout by the end of the first half of next year. And what is also important about our study is that when we set it up, we set it up so that we could also get a survival readout in this that would be powered for that even if we were just relatlimab like.

***So we think we are in as strong as position as possible within the realm of dice of clinical trials to be set up for success.*** And we are just adjusting to events as they come in. It's not the first time studies have had slow amounts of -- slowing of events that ultimately proved to be a good sign. And so that's kind of where we stand. I don't know if there's other specific questions you want me to address on it, I mean why . . .

90. Additionally, Defendant Lowy further touted the product candidate fianlimab's potential efficacy while minimizing any concerns regarding the Phase III Fianlimab Trial progress and timeline, in the following exchange:

[Q: Alexandria Janet Hammond]: You made a lot of ground.

[A: Defendant Lowy]: Yes, I did. I usually do. I would also just say why do we think -- people ask us also why do we think fianlimab is different, okay? So one thing is that we were able -- ***there are differences in terms of the molecule and that our molecule does have an Fc that was engineered to be inactive in terms of engaging antibody-dependent cellular cytotoxicity and cellular phagocytosis.***

> ***And we've seen in preclinically that there are clear differences between that and the competition.*** Whether or not this has -- we've also noticed that we've been able to dose higher doses, particularly in combination with chemotherapy, which is particularly important in some of the other indications we're testing and not encounter toxicity.
>
> So is that the reason? I'm not 100% sure, but it is a phenomenon that we're seeing. And as it turns out, because the timing is such that we will probably read out in the first half of next year. We also expect to have a potential for a substantial readout in our adjuvant study during that period of time as well. It will be an interim analysis, may not be mature enough, but we will certainly have some initial analysis. So we -- I can't -- it's like a pregnancy. ***I can't make it go any faster. But we'll -- we're sticking with it and trying to get through to the end and cautiously optimistic.***

91. Defendant Lowy went on to highlight Regeneron's additional "other agents" that could potentially combine with the fianlimab and Libtayo. Specifically, Defendant Lowy stated, in relevant part:

> [Q: Alexandria Janet Hammond] . . . I guess any last comments on the combination before we maybe move to just Libtayo as a monotherapy.
>
> [A: Defendant Lowy] I would add that one of the things that we set out to develop -- when we got into immuno-oncology quite a while ago, was to be able to have a toolbox of agents that we can combine. And ***we have other agents in clinical development that we think could ultimately combine with Libtayo-fianlimab combination***. So -- to be honest, when we started with -- as a segue to Libtayo, we decided we needed a PD-1 to enable our entire strategy, and we made sure that, that PD-1 would stand tall and be second to no one.
>
> And as -- and as you've seen, that's been true, and it's -- that's the case, and it's actually commercially doing reasonably well and probably surprising some of the people that were originally said, you really want to get another PD-1. So with fianlimab, it's the same story. We have another combination, but we're not done. We have other things behind it. So these things will come in waves. So we're building always building for the future.

***December 2, 2025 Evercore Conference***

92. On December 2, 2025, Defendant Crowe spoke on behalf of the Company at the Evercore 8th Annual Healthcare Conference (the "Evercore 2025 Conference"). During the Evercore 2025 Conference, Defendant Crowe highlighted the Company's expectations for the Phase III Fianlimab Trial results. Specifically, in the following exchange, Defendant Crowe stated:

> [Cory William Kasimov, Evercore ISI Institutional Equities – Research Analyst]: . . . moving on to LAG-3. What do you believe you need to see in fianlimab? It's always been a mouthful. The frontline metastatic melanoma Phase III trial for this product some point next year to become a commercial success? I guess what's the ideal outcome here?
>
> [Defendant Crowe]: The ideal outcome would be ***replicating the data that we saw in the Phase I*** pooled cohorts where we had 3 independent cohorts that in total was around -- was 98 patients and produced a response rate of, I believe, 57% and a pooled median PFS of 24 months. That would be fantastic to replicate in a Phase III setting. ***I think the bar for being differentiated, of course, starts with beating pembrolizumab, which is the control arm of our Phase III study.*** But beyond that, looking across trial at the approved LAG-3 agent from Bristol, where the response rate was 43% and had a median PFS of 10 months. ***I think improvement from there would be potentially practice changing depending on the magnitude***. So we're clearly focusing on a result that not only beats pembro, but is competitive across the field and think that something in the low to mid-teens in terms of median PFS would achieve that. ***Of course, we aspire for more,*** but we'll get that data in the first half of 2026 and eagerly await those results along with you.

***December 3, 2025 Citi Conference***

93. On December 3, 2025, Defendant Crowe attended the Citi 2025 Conference on behalf of the Company. During the Citi 2025 Conference, Defendant Crow reiterated the status of the Phase III Fianlimab Trial and highlighted his optimism in its success. Specifically, the following exchange occurred where Defendant Crowe stated, in relevant part:

> [Geoffrey Christopher Meacham, Managing Director at Citigroup Inc.:] . . . Well, let's switch gears to a pipeline. We can talk about Libtayo too, but for LAG-3, the -- maybe just remind us of the timing of when we could see that data? What was -- what does and -- you guys view kind of a win look like in terms of clinical differentiation and maybe just remind folks the assumptions of the study.
>
> [Defendant Crowe:] Sure. The -- we're conducting a Phase III study that combines fianlimab with Libtayo in first-line advanced melanoma, and we are using KEYTRUDA or pembrolizumab as our control arm. ***This study completed the PFS cohort enrollment in January, and we are awaiting enough events to read out the final endpoint or the primary endpoint, which is median PFS. We pushed out the timing of this readout to the first half of 2026 due to a slowing of event rates. So we continue to wait for events to accrue.*** And once we reach the number that has been dictated in our trial protocol, we'll complete the study. ***We have a lot of hope and confidence that fianlimab-plus Libtayo can generate a meaningful***

> ***differentiation against current standards of care.*** We look at PD-1 monotherapies, median PFSs range sort of in the mid-single digits, 4 months or so for pembrolizumab, around 5 months for nivolumab. And clearly, this study powered against KEYTRUDA, you want to have a statistically significant result, first and foremost. But when we look at other competing first-line melanoma therapy such as Opdualag from Bristol-Myers, which is another LAG-3, PD-1 combination product. They were able to generate a 43% response rate and a 10-month median PFS with no benefit to overall survival. In our Phase I/II studies, where we studied fianlimab plus Libtayo in 3 independent cohorts on a pooled basis of about 100 patients, the response rate was 57%, and the median PFS was around 24 months. ***So should we be able to even approach replicating that result, I think we'd have a very meaningful advanced -- for first line advanced melanoma. So we're excited about the data and hope that we can read it out in the next few months.***
>
> I'd add beyond first line advanced melanoma, we're also studying this combination in advanced -- adjuvant melanoma and which is a study that we fully enrolled and would anticipate first interim analyses to perhaps be conducted next year, dependent, of course on event rate accrual. Beyond that and beyond skin cancer, we also are looking at this combination in lung cancer, where we will read out some Phase II results in an all-comers population as well as in a high-expressing PD-L1 high-expressing population sometime in the first half of next year as well. ***But I think it all comes down to this first-line melanoma study showing that we truly have a differentiated combination here, relative to not only pembrolizumab but other standards of care in the setting, and we look forward to the results.***

***March 4, 2026 TD Cowen Conference***

94. On March 4, 2026, Defendant Crowe participated in the TD Cowen 46th Annual Health Care Conference (the "TD 2026 Conference") on behalf of the Company. During the TD 2026 Conference, Defendant Crowe continued to highlight the Company's confidence in the Phase III Fianlamb Trial despite a slowdown in event accrual. Specifically, Defendant Crowe stated:

> [Q: Tyler Martin Van Buren – TD Cowen – MD & Senior Equity Research Analyst] Great. Maybe a good segue to the pipeline. So Libtayo-fianlimab, LAG-3, frontline melanoma combo data coming by the end of the first half, maybe if you could just discuss expectations there, what we could see from the top line. And again, the delay, is it the active or the control arm outperforming or both? What are your latest thoughts?
>
> [A: Defendant Crowe] So I'll start with we are totally blinded to the data. We don't know what it is. The data is not mature yet. We continue to watch events accrue. And once we get to the magic number that's defined in the clinical trial protocol, we'll lock the database, analyze the data and then rate it out.

> ***We obviously have high hopes for this opportunity.*** We saw very compelling results across 3 independent cohorts in Phase I where, on a pooled basis across approximately 100 patients, we demonstrated a 57% objective response rate and a 24-month median PFS, which compares very favorably to the approved agents for this disease. If we're able to even approach replicating those results, I think we'll have the opportunity to really change the standard of care in advanced melanoma.
>
> ***Why the events have slowed***, that's the really big question we don't know the answer to yet. ***We hope that similar to the Phase I results, there was a high level of response and those response are very durable. And therefore, they're not seeing an accrual of events once these patients respond because they're not progressing. Of course, there is an outside chance that pembrolizumab is outperforming its historical analogs***, which has been something in the order of 4 to 5 months in the population that we enrolled.
>
> So that could happen as well. It's unclear at this time. We think we have got 2 differentiated antibodies. ***We've designed the study with statistical powering that we're very confident will demonstrate this result.*** And on overall survival, an endpoint that the incumbent LAG-3 therapy failed to achieve, we've actually powered it even further with additional patients. So there's a real opportunity to differentiate not only on response rate in PFS at this initial readout, but eventually on overall survival as well.
>
> And then further on LAG-3, we also have an interim analysis to be performed in the adjuvant setting for melanoma. I think the base case for that should be that the trial continues as uninterrupted adjuvant melanoma is a much harder bar, I would say, and we have no data in Phase I to support it. But we're going to see what we have here at the interim analysis in the near term as well.

***March 11, 2026 Leerink Conference***

95. On March 11, 2026, Defendant Crowe spoke on behalf of the Company at the 2026 Leerink Global Healthcare Conference ("Leerink 2026 Conference"). In the following exchange, Defendant Crowe discussed potential reasons for the delay in results for the Phase III Fianlimab Trial while minimizing risks or concerns in the study's progress, stating, in relevant part:

> [David Reed Risinger, Senior Research Analyst & Senior MD of Biopharma at Leerink Partners LLC:] So could you just talk about fianlimab, -- if you could provide an update. Obviously, the trial has been delayed. We're still awaiting the results. And I know that you've commented before. Obviously, there have been some investor concerns that maybe the pembro arm is performing dramatically better than anticipated. But would love to hear the latest please.

> [Defendant Crowe:] Sure. ***Certainly been a lot of scrutiny around this study and the readout has been delayed a couple of times***, and we're now still on track for a first half readout as we await these final PFS events to come in. ***We don't believe we've enrolled a population that would result in an outsized pembrolizumab benefit of above and beyond its historical analogs of, call it, 4 to 5 months***. Some of the inclusion criteria in some of the trials that have been recently conducted, I think, are slightly different than what we enrolled. And as a result, pembrolizumab perhaps did better in those trials than we would expect it to do here. We don't know how pembrolizumab is doing in our study.
>
> We are totally blinded to the events and where they're occurring. We only know the total number and how they are accruing at the rate in which they're accruing. So we will see. I think you can look at it from 2 different ways. ***On the negative side, pembrolizumab is doing something miraculous and amazing and it's going to have a much higher-than-anticipated median PFS or you could look at it and say, well, the active arms are actually doing quite well and are approaching the activity that we saw in the early human studies where pooled median PFS across 3 independent cohorts was 24 months.***
>
> I'd add that we feel that we've conservatively powered this study and actually have assumed pembrolizumab performs at a median PFS of 7 months, which is roughly 50% better than it has in first-line metastatic melanoma in past studies. And so based on that assumption and our assumption of at least Relatlimab/nivolumab [indiscernible] activity from our combination, ***we feel comfortable with the powering of the study even if pembro were to outperform its historical analogs.***

96. The statements in paragraphs ¶ 86-95 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Individual Defendants downplayed the risks to the Phase III Fianlimab Trial's statistical viability and the impact of sudden protocol changes; (2) the success of the Phase III Fianlimab Trial was overstated and lacked reliable evidence; and (3) as a result, the Phase III Fianlimab Trial would likely fail to reach its primary endpoint. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**<u>The Truth Begins To Emerge As The False And Misleading Statements Continue</u>**

***April 26, 2026, Earnings Call***

97. The truth began to emerge on April 26, 2026, when the Company held its Q1 2026 Earnings Call to discuss its financial performance for the period ended March 31, 2026. During the Q1 2026 Earnings Call, Defendant Yancopoulos revealed changes to the Phase III Fianlimab Trial protocol, stating, in relevant part:

> Turning to oncology. On fianlimab, our LAG-3 antibody in combination with Libtayo, our Phase III study in metastatic melanoma ***remains on track with results expected later in the second quarter of this year. The primary analysis of progression-free survival will now consider all patients enrolled in the study with a minimum follow-up of 6 months.***

98. On this news, the price of the Company's common stock dropped $45.41 or approximately 6.2%, from a closing price $731.77 per share on April 28, 2026, to a closing price of $686.36 per share on April 29, 2026. However, the Individual Defendants continued to obfuscate the truth about the Fianlimab Phase III Trial viability and prospects.

99. Despite this disclosure, during the Q1 2026 Earnings Call, Defendant Yancopoulos continued to tout the potential of the Fianlimab and Libtayo combination, stating in relevant part:

> Can I just say, I mean I want to comment that past performance should be the strongest indicator of future performance. There's only one company in recent history that have its own labs produced two $10 billion-plus blockbusters. And let me remind you that I think you and probably a lot of other investors never saw those coming or ignored what we were saying about them.
>
> So I think that investor confidence, I think, should in large part be reflecting historical performance and the recognition that where blockbusters come from sometimes for the investor community can't be directly anticipated. And the best way of producing very important big drugs is by having very exciting molecules across all stages of development that have enormous opportunity.
>
> And if you ***just look at our oncology programs, whether it's the fianlimab Libtayo***, whether you look at Lynozyfic, whether you also look at odronextamab in follicular lymphoma, ***these are all potential blockbusters***. The C5 franchise is a pipeline in a franchise, multiple blockbuster opportunities there. Our Factor XI customized

> approaches are looking more and more exciting, especially based on competitor data using, we think, inferior and less convenient approaches. And we just covered the obesity opportunity, which arguably could become the preferred obesity approach that not only addresses obesity, but more aggressively addresses cardiovascular morbidity. So I don't know, it's hard to think of a more exciting pipeline in the entire industry.

100. During the question-and-answer portion of the Q1 2026 Earnings Call, Defendant Yancopoulos further reiterated the potential and his excitement in Fianlimab's application in melanoma treatment:

> [Geoffrey Christopher Meacham, Managing Director at Citigroup Inc.:] On fianlimab and lung, I just wanted to see if you guys can give us a bit more context for not moving to Phase III, maybe what was observed in the data, and from a tolerability perspective, is there any read-through to melanoma or broader solid tumor in terms of strategy?
>
> [Defendant Yancopoulos:] Yes. I think that we've been talking about this for a long time. I mean ***we never indicated that we were excited about this opportunity. Our data from earlier-stage studies was always pointing us to the melanoma opportunity.*** Once we see that data, it will certainly guide our thinking forward and in terms of going into additional cancer settings as well. But as we've been saying for a while, ***we never had any reason to really believe that this was going to be a game changer in the lung cancer space.***

101. The statements in paragraphs ¶¶ 99-100 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Individual Defendants downplayed the risks to the Phase III Fianlimab Trial's statistical viability and the impact of sudden protocol changes; (2) the success of the Phase III Fianlimab Trial was overstated and lacked reliable evidence; and (3) as a result, the Phase III Fianlimab Trial would likely fail to reach its primary endpoint. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant

times.

***May 12, 2026 Bank of America Conference***

102. On May 12, 2026, Defendant Crowe spoke on behalf of the Company at the Bank of America Global Healthcare Conference 2026 ("BofA 2026 Conference"). During the BofA 2026 Conference, Defendant Crowe continued to highlight the market prospects for the use of Fianlimab as a treatment for metastatic melanoma. Specifically, in the following exchange, Defendant Crowe stated:

> [Tazeen Ahmad, MD in Equity Research & Research Analyst at BofA Securities:] Okay. Perfect. So now let's move on to fianlimab to the LAG-3 study. Maybe, Ryan, can you level set for us metastatic melanoma? What do you think is the rough total addressable market opportunity here? And how does that compare to the products that we just talked about, EYLEA, DUPIXENT for Regeneron?
>
> [Defendant Crowe*:]* We believe ***the global metastatic melanoma market opportunity is somewhere in the range of $2 billion to $3 billion.*** Obviously, there's standards of care, including PD-1 monotherapy, PD-1 plus CTLA-4 and the incumbent PD-1 LAG-3 product that's out there. ***With fianlimab, Libtayo, we believe that we have a potentially differentiated efficacy profile relative to that incumbent LAG-3 PD-1 product*** and we expect to get our data very near term. We certainly were encouraged by the promising Phase I data that we generated across three independent cohorts that when pooled, generated a median PFS of about 24 months and a complete response rate of 25%. And those compare very favorably to the incumbent LAG 3 product that had around 10 months of median PFS and around 12% or 13% complete response.
>
> And the differentiator against the CTLA-4 PD-1 combination, I think, is going to hopefully be efficacy as well. But certainly, on the safety side, we see a lot of toxicity with that combination. But at 11.7 months, the median PFS has set the highest bar for efficacy in this setting. So we're very encouraged. We are looking forward to getting this data and hopefully sharing with you guys shortly thereafter.

103. Defendant Crowe continued to make assurances of positive data expectations for the Phase III Fianlimab Trial, stating the Company "typically errors on the side of providing more detail" in its press releases and that he thought it was "safe to assume we'll say more than a positive study." Specifically, Defendant Crowe stated, in relevant part:

> [Q: Tazeen Ahmad] And what level of top line information should we expect?
>
> [A: Defendant Crowe] That's TBD, but I think ***Regeneron typically errors on the side of providing more detail in our top line press releases than most other companies***. ***I think it's safe to assume we'll say more than positive study and see a medical conference in 6 months***. I would think providing the medians across all arms would be an appropriate level of disclosure and perhaps more depending on the interim overall survival readout and the objective response rates. So we'll see exactly what we get from the DMC when the data reads out and put together a fulsome disclosure, I'm sure.

104. Also, Defendant Crowe was asked about what prompted protocol changes to the Phase III Fianlimab Trial and the reasoning behind the Company's decision to amend its protocol. Defendant Crowe responded, in relevant part:

> [Q: Tazeen Ahmad] Okay. And maybe we will wrap it up with this last question, which I think you might have gotten a couple of times in the last week or so. You did make that recent change to the statistical analysis plan. So that's going to now include all patients with at least 6 months of follow-up.
>
> Len and George talked about this a little bit, but maybe can you just reiterate what the genesis of that was when it started? When the idea came and why you think it's important to have it be the case as you go into the readout that this change was made?
>
> [A: Defendant Crowe] Yes. Thanks, Tazeen, for the question. I think there's certainly been some confusion out there about what actually happened, what the time lines for the decisions were. So let me kind of start from the beginning.
>
> We ran this study with originally with two cohorts, a PFS cohort, which was to include the first 1,175 patients or so across four arms, and that was going to be the population that contributed to the primary analysis of progression-free survival.
>
> Upon the 1,176 patient, we were going to begin enrolling a 360 patient cohort that was only going to contribute to the overall survival, secondary endpoint. And that enrollment ran from essentially January through late summer of 2025.
>
> ***As we move through 2025, we saw a very slow accumulation of PFS events in the PFS cohort, which went for several consecutive months into the second half of 2025. And we were beginning to get concerned about when exactly the readout would occur.***
>
> So what we decided to do, and this was ***in the fall of 2025 was to add the patients that were originally only going to contribute to the overall survival, secondary***

> ***endpoint to the primary analysis, without changing the number of events required to trigger the readout.***
>
> We also added the requirement that every patient would have the opportunity for at least 6 months of follow-up. And we did that because we didn't want to drop in those patients from the old OS cohort and then immediately read out the data when some of those patients would have just begun treatment.
>
> So all patients will have at least 6 months of treatment. We need to reach 399 events in high-dose fianlimab plus Libtayo plus pembro. That analysis and then the low-dose fianlimab versus pembrolizumab. Each of those need to equal 399 and the last patient first dose needs to be at least 6 months beyond that first -- that last patient first dose in order for us to lock the database and read it out.
>
> So ***it was done because of slow event rates, we made the protocol amendment towards the end of last year.*** I believe we submitted it to all the global regulatory authorities in November, December time frame. ***We had to wait until it was signed off by all of them before we began talking about it. And the EU member states that are involved in the study only approved this protocol amendment at the beginning -- towards the beginning of April,*** so only about a month ago. which is why it only became public then.
>
> So we're now locked and loaded. As I mentioned, we're fast approaching this readout. ***We're really looking forward to it, certainly have high hopes for this data set*** and look forward to sharing it with you as soon as we can.

105. The statements in paragraphs ¶¶ 102-104 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Individual Defendants downplayed the risks to the Phase III Fianlimab Trial's statistical viability and the impact of sudden protocol changes; (2) the success of the Phase III Fianlimab Trial was overstated and lacked reliable evidence; and (3) as a result, the Phase III Fianlimab Trial would likely fail to reach its primary endpoint. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH FULLY EMERGES

***May 15, 2026 Press Release***

106. On May 15, 2026, the Company issued the May 2026 Press Release which provided an "Update on Phase 3 Trial of Fianlimab (LAG-3 Inhibitor)." The May 2026 Press Release disclosed that the Phase III Fianlimab Trial, "***did not reach statistical significance of the primary endpoint*** of improvement in progression-free survival (PFS)."

107. On this news, the Company's common stock dropped $68.57 or approximately 9.8%, from a closing price of $698.25 per share on May 15, 2026, to a closing price of $629.68 per share on May 18, 2026.

## REPURCHASES DURING THE RELEVANT PERIOD

108. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $2.2 billion to repurchase approximately 2,987,433 shares of its own common stock at artificially inflated prices between November 2025 through April 2026.

109. According to the Company's Form 10-K, filed with the SEC on February 4, 2026 ("2025 10-K"), between November 1, 2025, to November 30, 2025, the Company repurchased 330,630 shares of its own common stock at an average price per share of approximately $689.69, for a total cost to the Company of approximately $228,032,205.

110. As the Company's stock was actually worth only $629.68 per share, the price at closing on May 18, 2026, the Company overpaid by approximately $19,841,106 for repurchases of its own stock between November 1, 2025, to November 30, 2025.

111. According to the 2025 10-K, between December 1, 2025, to December 31, 2025,

the Company repurchased 594,493 shares of its own common stock at an average price per share of approximately $735.19, for a total cost to the Company of approximately $437,065,309.

112. As the Company's stock was actually worth only $629.68 per share, the price at closing on May 18, 2026, the Company overpaid by approximately $62,724,956 for repurchases of its own stock between December 1, 2025, to December 31, 2025.

113. According to the Company's Form 10-Q filed with the SEC on April 29, 2026 ("Q1 2026 10-Q"), between January 1, 2026, to January 31, 2026, the Company repurchased 220,042 shares of its own common stock at an average price per share of approximately $763.60, for a total cost to the Company of approximately $168,024,071.

114. As the Company's stock was actually worth only $629.68 per share, the price at closing on May 18, 2026, the Company overpaid by approximately $29,468,025 for repurchases of its own stock between January 1, 2026, to January 31, 2026.

115. According to the Q1 2026 10-Q, between February 1, 2026, to February 28, 2026, the Company repurchased 354,193 shares of its own common stock at an average price per share of approximately $776.58, for a total cost to the Company of approximately $275,059,200.

116. As the Company's stock was actually worth only $629.68 per share, the price at closing on May 18, 2026, the Company overpaid by approximately $52,030,952 for repurchases of its own stock between February 1, 2026, to February 28, 2026.

117. According to the Q1 2026 10-Q, between March 1, 2026, to March 31, 2026, the Company repurchased 474,851 shares of its own common stock at an average price per share of approximately $756.21, for a total cost to the Company of approximately $359,087,075.

118. As the Company's stock was actually worth only $629.68 per share, the price at closing on May 18, 2026, the Company overpaid by approximately $60,082,897 for repurchases

of its own stock between March 1, 2026, to March 31, 2026.

119. According to the Company's Form 10-Q filed with the SEC on June 30, 2026 ("Q2 2026 10-Q"), between April 1, 2026, to April 30, 2026, the Company repurchased 396,630 shares of its own common stock at an average price per share of approximately $749.98 for a total cost to the Company of approximately $462,433,168.

120. As the Company's stock was actually worth only $629.68 per share, the price at closing on May 18, 2026, the Company overpaid by approximately $47,714,589 for repurchases of its own stock between April 1, 2026, to April 30, 2026.

121. According to the Q2 2026 10-Q, between May 1, 2026, to May 31, 2026, the Company repurchased 616,594 shares of its own common stock at an average price per share of approximately $670.45 for a total cost to the Company of approximately $413,395,447.[2]

122. As the Company's stock was actually worth only $629.68 per share, the price at closing on May 18, 2026, the Company overpaid by approximately $25,138,537 for repurchases of its own stock between May 1, 2026, to May 31, 2026.

123. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately ***$297,001,062.***

## DAMAGES TO REGENERON

124. As a direct and proximate result of the Individual Defendants' conduct, Regeneron will lose and expend many millions of dollars.

125. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CSO and Co-Founder, its SVP and Clinical Development Unit Head of Oncology, and its former SVP of Investor Relations and Strategic

[2] Upon information and belief, these repurchases were made during the Relevant Period.

Analysis, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

126. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

127. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

128. Such expenditures include the $297,001,062 that the Individual Defendants caused the Company to overpay for repurchases of its own stock while the stock price was artificially inflated as a result of the false and misleading statements alleged herein.

129. Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

130. As a direct and proximate result of the Individual Defendants' conduct, Regeneron has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE ALLEGATIONS**

131. Plaintiff brings this action derivatively and for the benefit of Regeneron to redress

injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Regeneron, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

132. Regeneron is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

133. Plaintiff is, and has been at all relevant times, a shareholder of Regeneron. Plaintiff will adequately and fairly represent the interests of Regeneron in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

134. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

135. A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Regeneron's Board consisted of the following twelve individuals: Defendants Yancopoulos, Bassler, Brown, Coles, Goldstein, Guarini, Poon, Schleifer, Schenkein, Sing, Thompson, and Zoghbi (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to six of the twelve Director-Defendants that were on the Board at the time this action was filed.

136. Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they knowingly or recklessly to engaged in. to make and/or cause the Company to make false and misleading statements and omissions of material facts, and as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by ***approximately $297 million*** for its own common stock during the Relevant Period. The

Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

137. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly issued and/or caused Regeneron to issue materially false and misleading statements. Specifically, the Director-Defendants caused Regeneron to issue false and misleading statements which were intended to highlight the statistical viability of the Phase III Fianlimab Trial and Fianlimab's market competitiveness while failing to disclose existing risks. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

138. Additional reasons that demand on Defendant Yancopoulos is futile follow. Defendant Yancopoulos has served as the Company's Co-Founder, President, and CSO since 1989. He has served as a Company director since 2001 and has served as the Co-Chair of the Board since June 2023. Defendant Yancopoulos also serves as a member of the Digital Technology Committee and the Technology Committee. The Company provides Defendant Yancopoulos with his principal occupation, for which he receives handsome compensation. Thus, as the Company admits, he is not an independent director. As a trusted, long-time Company director and the Co-Founder of the Company, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such

controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made or signed many of the false and misleading statements alleged herein. Defendant Yancopoulos is also a named defendant in the Securities Class Action. For these reasons, too, Defendant Yancopoulos breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139. Additional reasons that demand on Defendant Bassler is futile to follow. Defendant Bassler has served as a Company director since 2016. She also serves as a member of the Technology Committee and the Corporate Governance and Compliance Committee. Defendant Bassler received and continues to receive handsome compensation for her role as a Company director. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Bassler's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrates her motive to participate in the scheme. For these reasons, too, Defendant Bassler breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

140. Additional reasons that demand on Defendant Brown is futile follow. Defendant Brown has served as a Company director since 1991. He also serves as the Chair of the Technology Committee and as a member of the Corporate Governance and Compliance Committee. Defendant

Brown has received and continues to receive handsome compensation for his role as Company director. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Brown breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141. Additional reasons that demand on Defendant Coles is futile follow. Defendant Coles has served as a Company director since 2017. He also serves as a member of the Audit Committee and Compensation Committee. Defendant Coles has received and continues to receive handsome compensation for his role as a Company director. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Coles breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142. Additional reasons that demand on Defendant Goldstein is futile follow. Defendant Goldstein has served as a Company director since 1991. He also serves as a member of the Technology Committee and the Corporate Governance and Compliance Committee. Defendant Goldstein has received and continues to receive handsome compensation for his role as a Company director. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded

his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Goldstein breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143. Additional reasons that demand on Defendant Guarini is futile to follow. Defendant Guarini has served as a Company director since 2023. She also serves as a member of the Audit Committee and as the Chair of the Digital Technology Committee. Defendant Guarini has received and continues to receive handsome compensation for her role as a Company director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Guarini breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

144. Additional reasons that demand on Defendant Poon is futile follow. Defendant Poon has served as a Company director since 2010 and has served as the Lead Independent Director since 2023. She also serves as the Chair of the Compensation Committee and as a member of the Corporate Governance and Compliance Committee. Defendant Poon has received and continues to receive handsome compensation for her role as a Company director. As a trusted, long-time Company director and Lead Independent Director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Poon's

insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrates her motive to participate in the scheme. For these reasons, too, Defendant Poon breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

145. Additional reasons that demand on Defendant Schleifer is futile to follow. Defendant Schleifer co-founded the Company in 1988 and has served as the Company's President and CEO and as a Company director since. Since 2023, he has also served as the Co-Chair of the Board. Additionally, Defendant Schleifer serves as a member of the Technology Committee. The Company provides Defendant Schleifer with his principal occupation for which he receives handsome compensation. As such, as the Company admits, he is not an independent director. As the Company's co-founder and trusted CEO, Defendant Schleifer conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Schleifer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146. Additional reasons that demand on Defendant Schenkein is futile follow. Defendant Schenkein has served as a Company director since September 2023. He also serves as a member of the Technology Committee, Digital Technology Committee, and Compensation Committee. Defendant Schenkein has received and continues to receive handsome compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,

consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Schenkein breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147. Additional reasons that demand on Defendant Sing is futile follow. Defendant Sing has served as a Company director since 1988. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Sing has received and continues to receive handsome compensation for his role as a Company director. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Sing breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148. Additional reasons that demand on Defendant Thompson is futile follow. Defendant Thompson has served as a Company director since 2022. He also serves as a member of the Technology Committee and the Digital Technology Committee and as the Chair of the Corporate Governance and Compliance Committee. Defendant Thompson has received and continues to receive handsome compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Thompson breached his fiduciary duties, faces

a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149. Additional reasons that demand on Defendant Zoghbi is futile follow. Defendant Zoghbi has served as a Company director since 2016. She also serves as a member of the Technology Committee, Digital Technology Committee, and the Compensation Committee. Defendant Zoghbi has received and continues to receive handsome compensation for her role as a Company director. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Zoghbi's insider sales made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein further demonstrates her motive to participate in the scheme. For these reasons, too, Defendant Zoghbi breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

150. Additional reasons that demand on the Board is futile follow.

151. Defendant Sing (as Chair), Coles, and Guarini (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to disseminate materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of

fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions, including as it pertained to the viability of the Phase III Fianlimab Trial; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

152. In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity; failing to avoid conflicts of interest; failing to ensure the Company's disclosures were accurate; failing to ensure the Company complied with applicable laws, rules, and regulations; and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

153. Regeneron has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Regeneron any part of the damages Regeneron suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

154. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

155. The acts complained of herein constitute violations of fiduciary duties owed by Regeneron's officers and directors, and these acts are incapable of ratification.

156. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Regeneron. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Regeneron, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

157. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Regeneron to sue the Individual Defendants named herein, since, if they

did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

158. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least seven of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
## Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

159. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

160. The Individual Defendants, by virtue of their positions with Regeneron and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Regeneron and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Regeneron to engage in the illegal conduct and practices complained herein.

161. Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

## SECOND CLAIM
## Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

162. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

163. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Regeneron. Not only is Regeneron now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Regeneron by the

Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase ***2,987,433*** of its own shares at artificially inflated prices, damaging Regeneron.

164. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

165. The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Regeneron not misleading.

166. The Individual Defendants as top executives and directors acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

167. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**<u>THIRD CLAIM</u>**

**Against the Individual Defendants for Breach of Fiduciary Duties**

168. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

169. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Regeneron's business and affairs.

170. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

171. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Regeneron.

172. In breach of their fiduciary duties owed to Regeneron, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Individual Defendants downplayed the risks to the Phase III Fianlimab Trial's statistical viability and the impact of sudden protocol changes; (2) the success of the Phase III Fianlimab Trial was overstated and lacked reliable evidence; and (3) as a result, the Phase III Fianlimab Trial would likely fail to reach its primary endpoint. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

173. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

174. Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

175. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase over 2.9 million shares of its own common stock at artificially inflated prices before the fraud was exposed, while three of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $7.3 million.

176. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

177. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

178. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Regeneron has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

179. Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

## FOURTH CLAIM
**Against the Individual Defendants for Unjust Enrichment**

180. Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

181. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Regeneron.

182. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Regeneron that was tied to the performance or artificially inflated valuation of Regeneron, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

183. Plaintiff, as a shareholder and representative of Regeneron, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

184. Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

185. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

186. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Regeneron, for which they are legally responsible.

187. As a direct and proximate result of the Individual Defendants' abuse of control, Regeneron has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

188. Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

189. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

190. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Regeneron in a manner consistent with the operations of a publicly held corporation.

191. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Regeneron has sustained and will continue to sustain significant damages.

192. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

193. Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

**SEVENTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

194. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

195. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

196. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

197. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

198. Plaintiff, on behalf of Regeneron, has no adequate remedy at law.

## EIGHTH CLAIM
**Against Defendants Yancopoulos, Lowy, and Crowe for Contribution Under Sections 10(b) and 21D of the Exchange Act**

199. Plaintiff incorporates by reference and realleges each and every allegation set forth in above, as though fully set forth herein.

200. Regeneron and Defendants Yancopoulos, Lowy, and Crowe are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Yancopoulos', Lowy's, and Crowe's willful and/or reckless violations of their obligations as officers, directors, and/or former officers Regeneron.

201. Defendants Yancopoulos, Lowy, and Crowe, because of their positions of control and authority as officers, directors, and/or former officers of Regeneron, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Regeneron, including the wrongful acts complained of herein and in the Securities Class Action.

202. Accordingly, Defendants Yancopoulos, Lowy, and Crowe are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

203. As such, Regeneron is entitled to receive all appropriate contribution or

indemnification from Defendants Yancopoulos, Lowy, and Crowe.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Regeneron, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Regeneron;

(c) Determining and awarding to Regeneron the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Regeneron and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Regeneron and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;
2. a provision to permit the shareholders of Regeneron to nominate at least six candidates for election to the Board;
3. a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations;

(e) Awarding Regeneron restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 23, 2026

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi
Elizabeth Donohoe
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
shashmi@thebrownlawfirm.net
edonohoe@thebrownlawfirm.net

*Counsel for Plaintiff*

**VERIFICATION**

I, Steven Hopkinson, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of September 2026.

Signed by:
Steven Hopkinson
9D3770A25FC244E...
Steven Hopkinson